HARRIMAN v. FINAN.

(Supreme Court, Special Term, Orange County. February, 1912.)

1. WATERS AND WATER COURSES (§ 40*)—NATURAL WATER COURSES—NATURAL CONDITION.

Where a stream was widened, deepened, and altered by commissioners appointed under Laws 1869, c. 419, the altered channel was, as between the owners of the lands affected, to be regarded as the natural condition of the stream.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 32; Dec. Dig. § 40.]

2. WATERS AND WATER COURSES (§ 40*)—NATURAL WATER COURSES—NATURAL CONDITION—PRESUMPTION.

Where one, by permission, or at least without objection, did work on the lands of another upon the bed of a stream which flowed through his own lands, and which had several years previously been altered by commissioners appointed under Laws 1869, c. 419, the presumption was that he stayed within his rights and merely restored the stream to the condition it was in after the work done by the commissioners.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 32; Dec. Dig. § 40.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. WATERS AND WATER COURSES (§ 171*)—RIPARIAN RIGHTS—OBSTRUCTION.

A lower riparian owner cannot rightfully alter a stream by damming it and providing insufficient tiling and drainage pipes, and thereby damage higher lands belonging to another by causing them to be flooded in time of high water.

[Ed. Note.—For other cases, see Waters and 'Water Courses, Cent. Dig. §§ 216–222; Dec. Dig. § 171.*]

4. WATERS AND WATER COURSES (§ 62*)—RIPARIAN RIGHTS—OBSTRUCTION—
—INSUFFICIENT TILING.

Where a lower riparian owner places in the channel of a natural stream a tiling which is too small to carry off the water in ordinary high-water times, and then fills the channel above the tiling, an upper owner, whose lands are affected thereby, may require the tiling to be removed and the stream to be restored to its former condition.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 52; Dec. Dig. § 62.*]

5. WATERS AND WATER COURSES (§ 167*)—RIPARIAN RIGHTS—OBSTRUCTION—
DAM.

Where a lower riparian owner dams a stream so as to raise water in ordinary times in that part of the stream flowing through the lands of the next higher owner, and so as in high-water times to cause such lands to be flooded, the upper owner may require the dam to be altered so that in ordinary times the water in the stream at the boundary line will stand at its natural level.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 192, 194–202; Dec. Dig. § 167.*]

6. WATERS AND WATER COURSES (§ 52*)—RIPARIAN RIGHTS—OBSTRUCTION—
DAMAGES.

Where land was flooded from another's wrongful obstruction of a stream and from natural causes, and it was impossible to distinguish the injury to the land from each cause, the wrongdoer was liable for the entire damage.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 44; Dec. Dig. § 52.*]

Action by Mary W. Harriman against Thomas Finan. Judgment for plaintiff.

Joseph W. & Percy V. D. Gott, for plaintiff.
Bacon & Rorty, for defendant.

MILLS, J.   This is an action in equity to secure a mandatory injunction compelling the defendant to remove certain obstructions which he has placed and now maintains in the channel of a brook, and which the plaintiff alleges cause the water to flow back and to be detained upon her lands. The locality involved is situated in the western part of the village of Goshen. A stream, known locally as the Rio Grande, flows substantially from the south in a northerly direction, passing through a long and for the most part wide and very level valley. The lower section of the valley, some 500 feet or more in length, is now, and since 1909 has been, owned by the defendant; while the next higher section to the south, being about 2,000 feet in length, is now owned by the plaintiff, having been, since 1902, owned by her husband, the late Edward H. Harriman, and having, upon his recent death, by his will, passed to the plaintiff, his widow.

Ascending the stream in a southerly direction, one finds that, at a

point some 500 feet north of the dividing line between the two properties, the stream branches into two tributaries; one passing through the westerly side or part of the valley, and the other through the easterly side or part thereof. The latter tributary or branch, just across and south of such boundary line, divides again into two branches; one passing southerly, for a long distance, in plaintiff's lands, near the central portion thereof, and the other continuing through the easterly part thereof and being called the East branch or Reservoir stream. Of these latter two branches the central one appears to be a ditch and may have been originally entirely of artificial construction. But the other two tributary streams, viz., the East branch or Reservoir stream, and the West branch, are living, natural streams; each having its source some distance from plaintiff's lands, and each draining a considerable watershed.

Under chapter 419 of the Laws of 1869, by a commission appointed thereby, all these streams were widened, deepened, and altered, and various ditches leading thereunto constructed; compensation being made to the landowners affected, and an assessment for the expenses of the work being made upon the lands benefited. Although that act required the map made by the commissioners, showing the alterations made by them, and therefore, as I construe it, the levels of the altered channels and their widths as well as courses, to be filed in the office of the clerk of Orange county, yet there is in the case no direct proof of the contents of the map and thereby of the above-named details of the altered channels. Apparently such map cannot be found on file in that office, and the parties have not been able to find any extant copy of it.

Many years later, viz., in 1905, the plaintiff's testator, then the owner of the land now owned by her, at his own expense cleared out the channels of the streams through the land belonging to the defendant, apparently with the consent of the village authorities and with the consent of the then owner of the defendant's land, certainly without objection upon his part, and at the same time cleared out and apparently enlarged to some extent the like channels in his own land. From that time on the water in the streams flowed off from the plaintiff's lands efficiently, except in flood times, when, owing to the relatively small fall of the streams through all of the lands in question, portions of plaintiff's lands were flooded for several hours, and, in times of extreme freshet, larger portions of such lands were so flooded even for considerable periods of time, perhaps several days; such floods, however, soon subsiding.

The defendant purchased his land in 1909, and soon made certain changes in the channels of the two streams therein. The chief of those changes were the following:

He changed to some extent the channel and course of the two streams—that is, the East and West branches—so as to unite them to form the main brook, the Rio Grande, at a point about 200 feet north of their former junction. He changed the course of the West branch by making a channel for it along a line, which at a considerably earlier period it had followed, and placed at the bottom of that

channel a tile pipe 20 inches in diameter and about 300 feet long, which came at the north end within about 28 feet of—that is, north of—the boundary line, and was there about 1 foot higher than the bed of the stream at the boundary line. Some months later he extended that pipe southerly to about that line, making it fall or dip southerly about 1 foot to its southerly end. He filled in such channel or trench about and over the pipe to the general ground surface.

He changed the course of the East branch to some extent so as to use more conveniently the waters of that branch, which were much purer than those of the West branch, solely for his ice producing purposes; he being engaged in the ice business. The chief changes made by him in such East branch, as affecting the plaintiff's land, were that in establishing his series of three ice ponds he placed at the foot of all three, and at a distance of about 500 feet from the boundary line between the two properties, and a few feet from the new junction of the two streams, a dam, by which the water back or south of the dam in and through the three ponds could be raised to a height of 2.48 feet above the bed of the main stream, at the point of junction of the two streams, which is in the map in evidence designated as the zero point; and also that he constructed, between the second and third ponds, approximately 100 feet above the dam, a solid causeway with six tile pipes, twelve inches in diameter, through the causeway, from the second to the third pond, laid at levels of from 1.90 to 2.15 feet above zero—that is, the bed of the stream at the point of junction or at the location of the dam.

As the stream channels were left by the work performed in 1905, as above stated, the bottom of the bed of the East stream at the boundary line was only .96 of a foot above the bed level at zero point, and the bottom of the West branch or stream, at such boundary line, was only one foot above the bed level at the same zero point; so that after such work was completed in 1905, and before the defendant made his changes above recited, there was only about one foot of fall in the bed of the streams during the about 500 feet of their respective courses through the defendant's lands, between such boundary line and the zero point designated on the map.

The defendant is maintaining and claims the right to maintain the water in his ponds and the channels above his dam to the height of 2.48 feet above zero point.

The greater weight of the evidence establishes, and indeed the figures above given appear to me to demonstrate, that the result of the defendant's changes has been to flood back the water upon plaintiff's land, at least in ordinary times, in the stream channels for considerable distances, and in what might be termed ordinary flood or high-water times, to flood considerable areas of the plaintiff's lands, and along the West stream for considerable periods of time, much longer than before defendant's changes were made.

As to the West branch, it is perfectly evident that no tile pipe of anything like 20 inches in diameter, even if it were laid at the best grade possible between the boundary line and the zero point, can carry off the water of the West branch in high-water times.

As to the East branch, defendant's changes above noted have served to back the water substantially permanently up the channels in plaintiff's land to a considerable distance, and, by reason of the inadequacy of the causeway pipes, also to flood back upon the plaintiff's lands and hold there for considerable periods the flood waters. Thus it is plain that under those conditions—that is, with the defendant's dam maintained as it now is—the water in that branch, at the boundary line, must always be at least 1.48 feet deep; and the evidence shows that at ordinary state it is 1.52 feet deep there.

There is nothing in the outlet stream below zero point which would, if the defendant's obstructions were removed, keep the water back upon the plaintiff's land, except in times of extreme freshets, when it is plain that all the lands here involved must temporarily be flooded.

These present conditions obviously must be to the substantial detriment of the plaintiff's lands. The theory of defendant's experts that water, detained in the channels in her land not to exceed the top of the blue clay substratum, would not injure such land, seems to be at variance with the proven facts, as the evidence of the detention above that level does not seem sufficient as to its continuance to account for the actual injury proven. I am entirely satisfied that the flooding of the plaintiff's lands by the occasional extreme freshets, if the channels of the streams in defendant's lands were kept open as the work in . 1905 left them, would not cause any substantial damage to plaintiff's land by drowning out grass or making the top soil permanently water saturated, a situation which has been proven to have existed since defendant's changes above noted were made and became effective.

From the foregoing facts it is fairly to be inferred, I think, that the work done in 1905 in defendant's lands only restored the stream bed or beds therein to its or their original condition after the work was done by the commissioners under the act of 1869.

[1] I think, also, that the condition left by the commissioners' work must, as to the rights of these parties, be regarded as the natural condition of the stream. I do not at all agree with the learned counsel for the defendant in his contention that that condition should be regarded as that of artificial drains constructed by the several owners. The newly made or altered channels of the streams, not the lateral ditches, were still the beds of natural streams. For the additional burden, if any, to the lands of the various owners caused by the channels thus made in such beds, it is now to be presumed they received the due compensation provided by that act. It seems to me, also, that the greater weight of the evidence establishes that the work done by the plaintiff's testator in the lands, now of the defendant, in 1905, constituted only the restoration of the channels of the stream or streams to the original condition in which they were left by the work done by the commissioners in 1869.

[2] The plaintiff's testator had no right to do any more upon those channels within the land now belonging to the defendant. It is apparent that the then owner of that land did not object to such work, but permitted it to be done; and, in the absence of contradictory proof,

there being none such, it must here be presumed that plaintiff's testator in doing the work did not exceed such right.

[3] The law applicable to the facts above stated is clear, and indeed the learned counsel here, in their briefs, do not appear to be in conflict respecting it. Such law is that the owner of the lower section of land, through which the stream runs, cannot rightfully obstruct the flow of the water therein by means of a dam or any artificial change in the channel which shall detain the water so as to back it up upon the land of another owner in a higher section of the valley through which the stream runs and from which it flows into the former's land. Rothery et al. v. N. Y. Rubber Co., 90 N. Y. 30; Pixley v. Clark, 35 N. Y. 520, 91 Am. Dec. 72.

Upon application of this law to the above-recited facts, it is at once apparent that the defendant, in and by his constructions, has violated the right of the owner of the upper land and, by maintaining them, is still violating the plaintiff's right as such higher owner.

The plaintiff is entitled, therefore, to substantially the relief she asks in this action.

[4] As to the West branch, the defendant must be required to take up the pipe laid in the channel of that branch and open that channel to a depth so as to grade the bottom of it on substantially an evenly descending grade from the boundary between plaintiff's and defendant's land, at a depth there of .96 of a foot above the zero point bed level down to that point. As to that branch, this relief would have to be granted the plaintiff even if the level of the pipe as laid by defendant was proper, because the size of that pipe is entirely too small for the flow of the water in that branch during at least a considerable part of the year. The width of the branch to be thus opened must be at least five feet at the bottom, with the proper slopes at the sides, as I am satisfied that the old channel of that branch was there at least of that width.

[5] As to the East branch, the defendant must be required to remove his dam, or at least to lower it, to not to exceed 1.34 feet above the zero bed level, and also to open his causeway so as to freely admit of a passageway at least 6 feet wide to the depth of a bottom not to exceed 1.34 feet above the same zero bed level, and also to remove any other obstructions above his dam which may raise the bed of the channel above that level of 1.34 feet above the zero bed level. The level or height of 1.34 feet for the dam is reached by considering that the depth of the water in that, the East branch, at the boundary line, will not in time of low water—that is, the dry months—be lower than .34 of a foot. The defendant is entitled, therefore, to dam back, at the location of his dam that .34 and the 1 foot of the natural fall.

[6] As to such other obstructions, if any may be revealed by so lowering the water in the ponds and channels of the East branch, it evidently will be impossible to determine to what extent they might have been occasioned by natural causes, e. g., the deposit of sediment, if the defendant's wrongful obstructions had not existed. No doubt they must, to some substantial extent, have been caused by such wrongful obstructions; and therefore, upon elementary doctrine, the de-

fendant, as the wrongdoer, must be held responsible for the entire condition. It may well be that, had the defendant not wrongfully obstructed the stream, he would, as to such naturally arising obstructions, be bound only to permit the plaintiff to enter upon his (defendant's) land after due notice, and at her own expense clear away such naturally arising obstructions from the channels.

The work done in 1905 in both plaintiff's and defendant's lands was performed by the same firm of contractors. Hereinbefore it has been stated, in effect, that plaintiff's testator paid the expense of all that work. The greater weight of the evidence, however, indicates that the expense of that work in defendant's lands was defrayed by the village of Goshen, and not by the plaintiff's testator, although it seems to have been a popular belief or impression that he bore the expense of that work. Such misstatement, however, does not impair at all the reasoning above made, because, even if the village paid the expense, the significant fact remains that the work in defendant's lands was done by another party than the then owner thereof and with such owner's permission, or at least without his objection, all of which fairly indicates that such work constituted merely the restoration of the stream channels in defendant's land to the condition in which they were left by the work done by the commission of 1869. This conclusion seems to me to be the main thing in the determination of this controversy, at least as to the East branch or stream. As above remarked, the plaintiff, aside from this conclusion, would be entitled to relief as to the West branch, because the defendant's tile pipe there is manifestly too small.

Decision accordingly will be made in favor of the plaintiff in the manner above indicated.